The MINNEAPPLE CO., Respondent,

v.

William NORMANDIN, individually and d.b.a. Billy Buttons, Appellant.

No. C0-82-603.

Supreme Court of Minnesota.

Sept. 2, 1983.

**19**

Kevin Sullivan, St. Paul, for appellant.

Allan Shapiro, Minneapolis, for respondent.

AMDAHL, Chief Justice.

William Normandin appeals from the order for judgment of the Hennepin County District Court which awarded The Minneapple Company damages for trademark infringement plus attorney fees and which enjoined Normandin from all use of the infringing design.

The Minneapple Company is a partnership formed by Joshua Levenson, Stephen Jones, and Kurt Tausche.[1]  They developed the concept of "The Minneapple" as a nickname for the City of Minneapolis, based on a contrast with "the big apple," New York City.  On August 21, 1980, the partnership applied for and received registration as a trademark a design consisting of block letters spelling out "THE MINNEAPPLE." The letters are followed by a period and rest above a snow-covered apple, the stem of which rests between the two "P's."  The partnership claimed August 23, 1980, as the date of the first use of the trademark.  The Minneapple Company received its first shipments of T-shirts bearing the registered

1. Tausche subsequently withdrew from the partnership.

design sometime in August 1980, and made its first sale on August 25, 1980.[2]

The Minneapple Company promoted its concept in various ways, including give-aways of T-shirts and other novelty items on WLOL–FM radio, appearances on WCCO–TV, and mentions on WCCO radio. The concept was the subject of columns in Twin Cities newspapers and the subject of an article in the Mpls/St. Paul Magazine. The partnership commissioned the building of a "Minneapple" float, which was entered in local parades including the Minneapolis Aquatennial parade and the St. Paul Winter Carnival parade. The float was also featured at the Minnesota Kicks' soccer game. Additionally, at the time of trial, the partners were negotiating with the Minneapolis Chamber of Commerce for the official adoption of the nickname "The Minneapple" for the City of Minneapolis.

The Minneapple Company opened a retail outlet in St. Anthony Main in Minneapolis in 1980. The outlet, which is in the form of an apple cart, sells T-shirts, sweatshirts, coffee mugs, glasses, aprons, postcards, luggage tags, tote bags, and other items bearing the registered design. A second retail outlet is located in Southdale Mall. The Minneapple Company also has wholesaled its imprinted products to 48 retail outlets in the Twin Cities area. The partnership employs three full-time and 15 part-time employees.

In June 1981, the partners of The Minneapple Company became aware of a design on the market which they considered to be similar to their logo. The design was marketed by appellant Normandin, d/b/a Billy Buttons. The design consists of the letters "Minne," a line drawing of an apple with a happy face, then the letters "lis." The picture of the apple phonetically substitutes for a portion of the word "Minneapolis."[3] Below the design, in small letters, is: "© 1981 Billy Buttons."[4]

Normandin has been in business as Billy Buttons since 1975. He claimed to have originated his design in late January or early February 1981 without knowledge of the existence of the design "The Minneapple." Normandin claimed he was aware of an "apple-type" cart located at St. Anthony Main but was not aware of what was sold there. The trial court, however, found that Normandin had seen the partnership's "Minneapple" design at St. Anthony Main in February or March 1981.

In an attempt to protect a common-law copyright for his design, Normandin sent himself a certified letter postmarked March 19, 1981. The letter contained his design and the words: "The original designs, January 24, 1981," and "© 1981, all rights reserved." By the end of February 1981, Normandin had made the first sale of his design, in the form of buttons, to local retail outlets. He first sold a transfer design for T-shirts in May or early June 1981. Personal contact with potential customers was Normandin's sole means of promoting his design.

2. The partnership registered three similar designs as trademarks with the Secretary of State. These designs are not at issue in the instant matter, however, because The Minneapple Company has not marketed these alternative designs.

There was no evidence that the partners' names were filed or published as required by Minn.Stat. § 333.01 (1982) as persons conducting business of The Minneapple Company. However, the issue whether the partners' failure to register estops them from securing trademark law protection is not at issue in the instant case. Even if it were at issue, the general rule appears to be that equity would not estop the plaintiffs here. See Annot., 42 A.L.R.2d 516, 542–43 (1955).

3. Normandin has fashioned similar designs for the cities of Indianapolis and Annapolis. There is some evidence he has marketed the Indianapolis design but he apparently has not marketed the Annapolis design. Additionally, Normandin has made some effort to market his concept in Minneapolis, Kansas.

4. At trial Normandin was questioned on the purpose and source of a small "R" in a circle near the stem of the apple which was found on some of the versions of his design. It remains unclear whether Normandin had placed the symbol near the apple at some stage in his design process or whether the symbol appeared there because Normandin had taken the smiling face apple from a source in which it was a registered design.

During early summer 1981, Normandin's T-shirt transfer design was sold mainly at the Shirt Works and Novelty Nook retail outlets. Before and after stocking Normandin's design, Shirt Works had received customer requests for the "Minneapple" T-shirt. A Shirt Works clerk testified that initially she responded to customer requests by stating that the store did not have the requested design, but that it did have Normandin's transfer. Because most customers chose to purchase Normandin's design, the Normandin transfer subsequently was sold to customers who requested Minneapple T-shirts without the clerk distinguishing the design sold from the one requested. All the transfers sold contained the Billy Buttons copyright line in small print.

On June 15, 1981, the Minneapple Company commenced the present action for trademark infringement. The Hennepin County District Court issued a preliminary injunction on July 6, 1981, enjoining Normandin from marketing his transfer design and from "using or employing the T-shirt transfer design in advertising, promoting or in any way using the T-shirt transfer design that it currently manufactures or distributes." Subsequent to the preliminary injunction order, Normandin continued to sell buttons and mirrors containing the design because he interpreted the injunction to preclude only T-shirt and T-shirt transfer sales.

Following trial, the court found Normandin's design infringed The Minneapple Company's trademark and constituted unfair competition. The court issued an order permanently enjoining Normandin "from the manufacture, distribution, use, advertising, promotion, or sale" of the "Minne-Apple-Lis" design "on any product, item, goods or services in any manner within the State of Minnesota" and awarded the Minneapple Company $565, representing profits Normandin received as a result of the sale of products bearing the infringing design. The Minneapple Company also was awarded attorney fees of $2,500 plus costs and disbursements.

This appeal raises two issues: (1) whether the design of The Minneapple Company is entitled to trademark protection, and (2) whether Normandin's design is so similar to that of The Minneapple Company to constitute trademark infringement or unfair competition.

■ Whether a particular design is entitled to trademark protection depends on the nature of the design and on how the design is used. If a design is "geographically descriptive or deceptively nondescriptive" of the goods or services it represents, then the design is not entitled to trademark registration or protection unless it has become distinctive of the goods or services it represents. Minn.Stat. § 333.19, subd. 1(5)(b) (1982). *See also Imported Auto Parts Corp. v. R.B. Shaller & Sons, Inc.,* 258 N.W.2d 797 (1977). Additionally, the design must be used as a "nonfunctional" element of the product; that is, the design must serve a primary purpose of indicating the origin of the product. *See Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 772–73 (9th Cir.1981); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir.1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

■ Modification of a geographical word may make it sufficiently distinctive to entitle the resulting word or phrase to trademark protection. *See* 3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 18.21 (4th ed. 1983). Here the Minneapple design substantially modifies the geographical name of Minneapolis. We find it to be sufficiently distinctive for purposes of trademark protection.

We find more difficult the question whether the design is a "nonfunctional" element of the product. The Minneapple design is, in effect, the product marketed by The Minneapple Company. The design serves an ornamental function. We need not decide, however, whether a design may simultaneously serve an aesthetic function and constitute a trademark because we resolve this case on the issue of the similarity of the two designs.

**22**

Assuming that the Minneapple design is entitled to trademark protection, the burden of proof was on The Minneapple Company to establish infringement by showing that Normandin's design is "identical to or so similar to the registered mark as to be likely to cause confusion or mistake on the part of a purchaser of the goods or services or to deceive such a purchaser as to the source or origin of the goods or services * * *." Minn.Stat. § 333.28 (1982).[5] Likelihood of purchaser confusion also is an element of common-law unfair competition. *See Imported Auto Parts, Inc. v. R.B. Shaller & Sons*, 258 N.W.2d 797, 800–01 (Minn. 1977); *Jordan Sulphur Springs & Mud Bath Sanitarium Co. v. Mudbaden Sulphur Springs Co.* 135 Minn. 123, 126, 160 N.W. 252, 253 (1916).

In the memorandum accompanying his order, the trial judge stated that he found Normandin's design "strikingly similar" to that of The Minneapple Company. With regard to buyer confusion, the trial court relied upon the testimony of the Shirt Works clerk that Normandin's design was sold to customers requesting "Minneapple" T-shirts to find that "[v]ery few customers knew the difference between defendant's design and the Minneapple T-shirts."

In general, findings by a trial court regarding likelihood of confusion are factual findings and should not be disturbed by this court unless clearly erroneous. Minn.R.Civ.P. 52.01; *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 n. 6 (9th Cir.1980). However, in cases in which the critical evidence is documentary, there is generally no need to defer to the trial court's assessment of the documentary evidence. *See In Re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 225–26, 243 N.W.2d 302, 305–06 (1976); *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983).

Therefore, to the extent a finding of likelihood of confusion depends on a comparison of the two designs at issue, an appellate court may make an independent judgment regarding their similarity. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 n. 7 (2d Cir.1979); *Hills Brothers Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 380 (2d Cir.1970).

The two designs at issue here differ substantially. The Normandin design is distinguished from the design of The Minneapple Company in its concept as a phonetic device rather than a representation of Minneapolis as a small New York City. The Minneapple design is more sophisticated-looking than Normandin's simple line drawing containing a smiling face. Additionally, Normandin has made an effort to distinguish his design from that of The Minneapple Company by including the copyright words along with his designs. That effort is important to preventing customer confusion. *Cf. Imported Auto Parts, Inc. v. R.B. Schaller & Sons*, 258 N.W.2d 797, 800 (Minn.1977) (effort by defendant to distinguish trade name important to finding no unfair competition). Any confusion that may result probably is due to the fact that both designs originate from the name of the City of Minneapolis and are marketed as souvenirs of the city.

The purpose of trademark law is to protect the public from confusion regarding the sources of goods or services and protect business from diversion of trade through misrepresentation or appropriation of another's goodwill. *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 P.2d 1004, 1010–11 (5th Cir.), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). However, the consequence of such protection is the bestowal of a monopoly upon the

---

5. Our trademark statutes, Minn.Stat. §§ 333.18 to 333.31, were passed in 1959 and patterned closely after relevant provisions of the federal Lanham Trade-Mark Act, 15 U.S.C. §§ 1051 to 1127. Under the Lanham Act, the requirement of likelihood of purchaser confusion is satisfied by "[t]he public's belief that the mark's owner sponsored or otherwise approved the use" of the alleged infringing mark. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir.1979); *see International Order of Job's Daughters v. Lindeburg and Company*, 633 F.2d 912, 920 (9th Cir.1980).

owners of trademarks. In the instant case, to find infringement by Normandin of The Minneapple Company's mark would be to grant the company a monopoly over the use of an apple with any portion or version of the name of the City of Minneapolis. We decline to grant The Minneapple Company such a monopoly. We hold that the design created and marketed by Normandin does not rise to the level of similarity required to constitute either trademark infringement under Minn.Stat. § 333.28 (1982) or common-law unfair competition.

Reversed.